IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

NJOY, LLC, <u>et al.</u>,
    Plaintiffs,

v.                      Civil No. 3:25-cv-930

THE INTERNATIONAL TRADE
COMMISSION, <u>et al.</u>,
    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (sometimes, "the MOTION") (ECF No. 20), the MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 21), the OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 31), and PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION (ECF No. 36). For the reasons set forth below, PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 20) will be denied.

## I. BACKGROUND

On November 7, 2025, NJOY LLC, NJOY Holdings, Inc. (together, "NJOY"), Altria Group, Inc., Altria Group Distribution Co., and Altria Client Services (collectively with NJOY, "Plaintiffs") filed a COMPLAINT (ECF No. 1) against the International Trade Commission (the "Commission"); Amy A. Karpel, David S. Johanson, and Jason E. Kearns, in their official capacities as Commissioners of the Commission; and Doris Johnson Hines, in her official

capacity as an Administrative Law Judge ("ALJ") of the Commission (collectively, sometimes "Defendants"). By way of their Complaint, Plaintiffs seek to enjoin the Commission's alleged unlawful administrative proceeding against Plaintiffs (the "ITC Proceeding"), concerning Plaintiffs' importation into the United States of certain e-vapor devices, cartridges used therewith, and components thereof. ECF No. 1 at ¶ 1.

Plaintiffs claim that the ITC Proceeding violates three constitutional separation-of-powers principles. ECF No. 1 at ¶ 1. First, Plaintiffs argue that the ALJ presiding over the ITC Proceeding was improperly appointed, in violation of the Appointments Clause. ECF No. 1 at ¶ 2. Second, Plaintiffs contend that the ALJ presiding over the ITC Proceeding enjoys two layers of for-cause protection from presidential removal, in violation of Article II. ECF No. 1 at ¶ 3. Third, Plaintiffs assert that the Commission seeks to adjudicate Plaintiffs' private rights outside of the judiciary and without a jury, in violation of Article III and the Fifth and Seventh Amendments. ECF No. 1 at ¶ 4.

The Commission is an Executive Branch agency comprised of six commissioners appointed by the President and confirmed by the Senate. ECF No. 1 at ¶ 21; see 19 U.S.C. § 1330. The Commission is charged with, among other things, investigating the importation of an article into the United States, or the sale of an article within the United States after importation, that infringes a valid and

2

enforceable United States patent. ECF No. 1 at ¶ 24; see 19 U.S.C. § 1337(a)(1)(B). An investigation instituted pursuant to 19 U.S.C. § 1337 is referred to as a "Section 337" investigation or administrative proceeding. ECF No. 1 at ¶ 25. If, in a Section 337 administrative proceeding, the Commission finds a violation, it is statutorily directed to issue an order excluding the violative articles from entry into the United States, unless the Commission determines that certain factors related to public welfare and competitive conditions counsel otherwise. 19 U.S.C. § 1337(d)(1).

Section 337 administrative proceedings are heard in the first instance by an ALJ. 19 C.F.R. § 210.3. After conducting an evidentiary hearing, the ALJ issues an initial determination whether the complainant has demonstrated that respondents have violated Section 337. Id. § 210.42(a)(1)(i). The Commission, and ultimately the President, may elect to review the initial determination, but, if neither conducts such review within the time prescribed by statute, the initial determination becomes the final action of the Executive. Id. §§ 210.42(h)(2), 210.49(d).

On August 8, 2025, JUUL Labs, Inc. ("JUUL") filed with the Commission a complaint under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, against Plaintiffs. ECF No. 1 at ¶¶ 36-37. JUUL's complaint alleges, among other things, that Plaintiffs have unlawfully imported and/or sold within the United States after importation certain e-vapor devices, cartridges used

3

therewith, and components thereof that infringe claims 1, 2-8, and 10 of U.S. Patent No. 12,156,533, specifically with respect to the formulation of the "e-liquid" contained in the accused products. ECF No. 1 at ¶ 38. On September 9, 2025, the Commission instituted a Section 337 investigation designated as No. 337-TA-1460. ECF No. 1 at ¶ 39. On September 25, 2025, ALJ Hines scheduled a claim construction hearing for January 8, 2026, and an evidentiary hearing for April 22, 2026. ECF No. 1 at ¶ 41.

On December 8, 2025, pursuant to Federal Rule of Civil Procedure 65, Plaintiffs filed PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 20). Plaintiffs seek to "enjoin[] Defendants from conducting or proceeding against Plaintiffs in Investigation No. 337-TA-1460," currently pending before the Commission. ECF No. 20 at 1. In support of their Motion for Preliminary Injunction, Plaintiffs, as they did in their Complaint, assert that (1) the ALJ presiding over the investigation is an inferior officer of the United States who was not appointed in accordance with the Appointments Clause (COUNT I), (2) the ALJ is insulated by two layers of for-cause removal protection, in violation of Article II (COUNT II), and (3) the Commission, an Executive Branch administrative agency, is purporting to adjudicate private rights in violation of Article III of the U.S. Constitution and the Fifth and Seventh Amendments (COUNT III). See ECF No. 21 at 8.

4

On April 14, 2026, ALJ Hines issued her initial determination, concluding "that each asserted claim of the only asserted patent, U.S. Patent No. 12,156,533, is invalid under 35 U.S.C. § 102(a)(1)" and that "there is no violation of Section 337." See ECF No. 42 at 2. Plaintiffs maintain that ALJ Hines's initial determination "does not moot Plaintiffs' pending Motion[] for Preliminary Injunction . . . because the Complainant JUUL Labs, Inc., petitioned the Commission to review the ALJ's final initial determination on April 24, 2026." ECF No. 42 at 2. However, during a conference call with the parties held on May 5, 2026, Plaintiffs informed the Court that the only argument they continue to assert in support of their MOTION is that the Commission, an Executive Branch administrative agency, is purporting to adjudicate private rights, in violation of Article III of the U.S. Constitution and the Fifth and Seventh Amendments (COUNT III).

On July 2, 2026, Defendants filed their NOTICE (ECF No. 54) informing the Court that the Commission has decided "to review the [ALJ's] April 14, 2026 Order that granted a motion for summary determination of invalidity and found no violation of 19 U.S.C. § 1337." ECF No. 54 at 2. "On review, the Commission can determine to affirm the ALJ's determination, reverse the ALJ's determination, or remand the investigation to the ALJ for further proceedings." ECF No. 54 at 2.

## II. LEGAL STANDARD

Because a preliminary injunction grants relief, albeit temporarily, before trial on the merits, it is an "extraordinary and drastic remedy," Munaf v. Geren, 553 U.S. 674, 689 (2008) (citation omitted), "that may only be awarded upon a clear showing that the plaintiff is entitled to such relief[,]" Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). And it should be "granted only sparingly and in limited circumstances." MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 816 (4th Cir. 1991)). To obtain a preliminary injunction, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20.

## III. ANALYSIS

### A. Whether Plaintiffs are Likely to Succeed on the Merits

The lynchpin component of a claim for preliminary injunctive relief is a showing that Plaintiffs are likely to succeed on the merits of their case. Plaintiffs "need not establish a 'certainty of success,' but must make a clear showing that [they are] likely to succeed at trial." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). That, of course, necessitates an examination of

6

the claim(s) upon which the request for the preliminary injunction is based. Here, Plaintiffs allege that the Commission, an Executive Branch administrative agency, "is purporting to adjudicate private rights in violation of Article III of the U.S. Constitution and the Fifth and Seventh Amendments." ECF No. 21 at 8.

### 1. Plaintiffs Have Not Sufficiently Demonstrated That the ITC Proceeding Involves Private Rights

Plaintiffs' constitutional claim is based on Article III of the Constitution: Plaintiffs maintain that the ITC Proceeding violates the separation of powers because it involves the adjudication of private rights, which can only be done by an Article III court. "Article III vests the judicial power of the United States 'in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.'" Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC, 584 U.S. 325, 333-34 (2018) (quoting U.S. CONST. art. III, § 1). "The Constitution prohibits Congress from 'withdrawing from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law.'" Sec. & Exch. Comm'n v. Jarkesy, 603 U.S. 109, 127 (2024) (quoting Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 284 (1856)). "Once such a suit 'is brought within the bounds of federal jurisdiction,' an Article III court must decide it, with a jury if the Seventh Amendment

7

applies." Jarkesy, 603 U.S. at 127 (quoting Stern v. Marshall, 564 U.S. 462, 484 (2011)).

On that basis, the Supreme Court has "explained that matters concerning private rights may not be removed from Article III courts." Jarkesy, 603 U.S. at 127. In determining whether a suit concerns private rights, the Supreme Court has looked to "whether it 'is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789.'" Id. at 128 (quoting Stern, 564 U.S. at 484). "If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory." Jarkesy, 603 U.S. at 128 (citing Stern, 564 U.S. at 484).

In contrast to common law "private rights" claims, the Supreme Court has recognized a class of cases concerning "public rights," where no involvement by an Article III court in the initial adjudication is necessary. See Jarkesy, 603 U.S. at 128. These public rights were matters that "'historically could have been determined exclusively by the executive and legislative branches,' . . . even when they were 'presented in such form that the judicial power was capable of acting on them . . . .'" Id. (quoting Stern, 564 U.S. at 493; Murray's Lessee, 59 U.S. at 284) (internal citations omitted).

The Supreme Court has held "that the Federal Government need not be a party for a case to revolve around 'public rights.'"

8

Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 54 (1989) (citing Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 586 (1985)). However, the Supreme Court has continued "to limit the [public rights] exception to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." Stern, 564 U.S. at 490. "In other words, it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular Federal Government action." Id. at 490-91.

"The crucial question, in cases not involving the Federal Government, is whether 'Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, has created a seemingly "private" right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary.'" Granfinanciera, 492 U.S. at 54 (quoting Thomas, 473 U.S. at 593-94). "If a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court." Granfinanciera, 492 U.S. at 54-55.

9

The Supreme Court in Jarkesy identified certain categories of adjudications that have historically fallen within the public rights exception. In particular, the Supreme Court noted that the exception has extended beyond traditional revenue collection disputes to matters arising from Congress's plenary authority over foreign commerce and importation. See Jarkesy, 603 U.S. at 128-30; Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320 (1909); Ex parte Bakelite Corp., 279 U.S. 438 (1929).

For example, in Oceanic Steam Navigation Co., the Supreme Court upheld, against an Article III challenge, the administrative imposition of monetary penalties on a steamship company for violating congressional restrictions on the importation of aliens afflicted with "loathsome or dangerous contagious diseases[.]" 214 U.S. at 331-34; see Jarkesy, 603 U.S. at 129. As explained in Jarkesy, "Congress's power over foreign commerce . . . was so total that no party had a 'vested right' to import anything into the country." Jarkesy, 603 U.S. at 129 (citing Oceanic Steam Navigation Co., 214 U.S. at 335); see also Buttfield v. Stranahan, 192 U.S. 470, 492 (1904) ("The power to regulate commerce with foreign nations is expressly conferred upon Congress, and, being an enumerated power, is complete in itself, acknowledging no limitations other than those prescribed in the Constitution.").

Additionally, in Ex parte Bakelite Corp., the Supreme Court highlighted that the political branches have long exercised broad

10

authority to regulate imports through tariffs and exclusionary measures, including the authority to impose duties or exclude foreign goods entirely when necessary to address unfair competition, a domain traditionally committed to executive and legislative control rather than judicial adjudication. 279 U.S. at 446, 458, 460-61; see Jarkesy, 603 U.S. at 130. The administrative proceeding at issue in Bakelite is notably similar to the ITC Proceeding in this case and, therefore, warrants careful attention. Bakelite involved a "petition for a writ of prohibition to the Court of Customs Appeals prohibiting [the Court of Customs Appeals] from entertaining an appeal from findings of the Tariff Commission in a proceeding begun and conducted under section 316 of the Tariff Act of 1922 . . . ." 279 U.S. at 446 (internal citation omitted).[1] As part of the underlying proceeding at issue in Bakelite, the Commission was tasked with determining whether the "importation and sale of beads and other materials or articles made by synthetic phenolic resin" constituted an unfair act because the challenged goods infringed a valid United States patent, thereby justifying the granting of relief under section 316. Frischer & Co. v. Bakelite Corp., 39 F.2d 247, 250-51 (C.C.P.A.

---

[1] Section 316 of the Tariff Act of 1922 is the historical predecessor to Section 337 of the Tariff Act of 1930. See Suprema, Inc. v. Int'l Trade Comm'n, 796 F.3d 1338, 1344 (Fed. Cir. 2015); see also LSI Comput. Sys., Inc. v. Int'l Trade Comm'n, 832 F.2d 588, 589 (Fed. Cir. 1987) ("Section 337 of the Tariff Act of 1930 is a reenactment of Section 316 of the Tariff Act of 1922.").

1930). "The Commission made findings sustaining the charge, and recommended that the articles to which the unfair practice relates be excluded from entry." Ex parte Bakelite Corp., 279 U.S. at 447. "The importers appealed to the Court of Customs Appeals, where the Bakelite Corporation challenged the court's jurisdiction on constitutional grounds." Id.

In support of its constitutional challenge, the Bakelite Corporation argued "(1) [t]hat the Court of Customs Appeals is an inferior court created by Congress under section 1 of article 3 of the Constitution, and as such it can have no jurisdiction of any proceeding which is not a case or controversy within the meaning of section 2 of the same article" and "(2) [t]hat the proceeding presented by the appeal from the Tariff Commission is not a case or controversy in the sense of that section, but is merely an advisory proceeding in aid of executive action." Id. at 448. In denying the writ of prohibition, the Supreme Court in Bakelite held that the Court of Customs Appeals was a legislative court, not an Article III constitutional court. Accordingly, the Supreme Court found that no inquiry was required into "whether the proceeding under section 316 of the Tariff Act of 1922 . . . [was] a case or controversy within the meaning of section 2 of article 3 of the Constitution, for th[at] section applies only to constitutional courts[,]" which the Court of Customs Appeals was not. Id. at 460-61.

12

Implicit in the holding of Bakelite is the related finding that the section 316 proceeding did not involve private rights. As stated above, "matters concerning private rights may not be removed from Article III courts." Jarkesy, 603 U.S. at 127. However, the Supreme Court in Bakelite permitted adjudication of the section 316 proceeding by the Court of Customs Appeals, a non-Article III legislative court, which teaches that the section 316 proceeding falls outside the category of "private rights" disputes. See Ex parte Bakelite Corp., 279 U.S. at 460-61. That conclusion finds further support in Jarkesy itself. In discussing the historical scope of the public rights exception, the Supreme Court in Jarkesy cited Bakelite as an example of Congress's authority to assign certain matters arising from foreign commerce and importation to a non-Article III tribunal. See Jarkesy, 603 U.S. at 130. That discussion substantially confirms that the section 316 proceeding at issue in Bakelite involved private rights.

At this stage in the litigation, it appears that the ITC Proceeding at issue involves public rights, not private rights. Pursuant to 19 U.S.C. § 1337, the Commission adjudicates allegations of certain unfair practices in import trade (e.g., the importation into the United States of articles that infringe a valid and enforceable United States patent). See id. § 1337(a)(1)(B). If the Commission determines that Section 337 has been violated, the Commission may issue an exclusion order barring

13

the products at issue from entry into the United States as well as issue "cease and desist" orders directing the violating party to cease certain actions. Id. § 1337(d), (f). Pursuant to 19 U.S.C. § 1337(a)(1)(B), the ITC Proceeding may require a determination of the validity of the patent if a challenge is raised by the respondent in the ITC Proceeding. However, the "nature of the action" does not directly involve the patentee's private rights because that validity determination is made solely for the purpose of ascertaining whether the challenged goods infringe a valid United States patent and therefore constitute an unlawful act under 19 U.S.C. § 1337(a)(1)(B). Importantly, if the patent is determined to be invalid during the ITC Proceeding, that finding does not extinguish the patent holder's patent rights. This is because patent validity determinations in ITC Proceedings "have no preclusive effect in other forums . . . ." Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1569 (Fed. Cir. 1996). Thus, ITC Proceeding patent validity determinations serve the limited purpose of helping to assess whether the patent holder has a valid claim for an exclusion order under § 1337(a)(1)(B).

With that context in mind, the Commission's adjudication under Section 337 does not involve the final resolution of a traditional common law cause of action (e.g., traditional patent infringement suits) seeking relief between private parties. Rather, the Commission's authority is directed toward determining

14

whether imported articles should be excluded from entry into the United States pursuant to Congress's constitutional authority to regulate foreign commerce. See U.S. CONST. art. I, § 8, cl. 3. The exclusion remedy authorized by Section 337 is regulatory in nature, aimed at protecting domestic industries and controlling the conditions under which foreign goods may enter the stream of United States commerce. Because (1) the focus of a Section 337 proceeding concerns whether certain challenged goods may lawfully be imported into the United States and (2) any patent-related findings related to a Section 337 proceeding are made only insofar as they are necessary to resolve that specific regulatory question, the challenged ITC Proceeding falls within the public rights exception. The Supreme Court has clearly stated that Congress's power over foreign commerce was so total that "no party had a 'vested right' to import anything into the country." Jarkesy, 603 U.S. at 129 (citing Oceanic Steam Navigation Co., 214 U.S. at 335). And seeing as how any patent validity determination carries no preclusive effect, see Texas Instruments Inc., 90 F.3d at 1569, the ITC Proceeding does not implicate any traditional "private rights." Instead, the focus is on the broader regulation of imports and foreign commerce. Plaintiffs have not shown otherwise. Therefore, at this stage in the litigation, Plaintiffs have not sufficiently met their burden to prove that they are likely to succeed in establishing that the challenged ITC Proceeding

15

involves the adjudication of private rights, in violation of Article III.

This conclusion is supported by the Supreme Court's holding in Bakelite. The similarities between the section 316 proceeding at issue in Bakelite and the Section 337 proceeding challenged here are substantial. In both cases, an administrative body was tasked with determining whether challenged foreign goods violated a federal prohibition on unfair import practices, including patent-based unfair acts, and whether those foreign goods should therefore be excluded from entry into the United States. In both settings, the patent-related findings serve only as predicates to the ultimate regulatory determination of whether the challenged goods should be excluded from entry. And, in both settings, the primary remedy was exclusion rather than an award of damages or other traditional relief between private parties. Given that the proceeding in Bakelite fell outside the category of "private rights" disputes, and considering the substantial similarities between the section 316 proceeding in Bakelite and Section 337 proceeding at issue in this case, it is difficult to see why the Section 337 proceeding challenged here should be viewed differently. For these reasons, Bakelite undercuts Plaintiffs' assertion that the challenged ITC Proceeding implicates private rights, further demonstrating that Plaintiffs have not met their burden of establishing a likelihood of success on the merits.

16

Plaintiffs suggest that Bakelite only answered the question "whether an appeal from a recommendation by the Tariff Commission to the Court of Customs Appeals required adjudication consistent with Article III." See ECF No. 21 at 23-24 ("The [Supreme] Court therefore said nothing about whether the importation of articles into the United States generally implicates public rights, nothing about whether a cease-and-desist order against the sale of items implicates public rights, and nothing about the proper forum for adjudication of private patent disputes."). However, these suggestions are insufficient, at this stage, to convince the Court that Plaintiffs are likely to succeed on the merits of their Article III challenge. Given the substantial similarities between this case and Bakelite, as outlined above, and the treatment of Bakelite as a public rights case by the Supreme Court in Jarkesy, the Court finds that Bakelite provides significant support for the conclusion that the ITC Proceeding challenged here involves public rights. For this reason, and the other reasons provided above, Plaintiffs fail to satisfy their burden of establishing that they are likely to succeed on the merits as to their Article III challenge to the ITC Proceeding.

Plaintiffs also contend that "Defendants do not even try to identify any authority that would substantiate the power of a non-Article III court" "to issue cease-and-desist orders that apply to products in the United States." ECF No. 36 at 13. In turn,

17

Plaintiffs conclude, without providing any supporting argument or citations, "[t]hat alone dooms [Defendants'] exclusive reliance on an untenably sweeping interpretation of Bakelite." ECF No. 36 at 13. The Court disagrees. Plaintiffs' attempt to distinguish Bakelite by highlighting the ability of cease-and-desist orders to prevent the sale and marketing of any already-imported products falls short. The availability of such orders as a remedy does not sufficiently remove the ITC Proceeding from the public rights exception as the core action involves a novel regulatory scheme that would have been "unknown to the common law." Jarkesy, 603 U.S. at 138-39; see Sligo Creek Ctr. v. United States Dep't of Health & Hum. Servs., No. 25-1669, 2026 WL 1615174 at *5 (4th Cir. June 5, 2026).

In further support of their argument that the challenged ITC Proceeding seeks to adjudicate their private rights, in violation of Article III, Plaintiffs assert that the ITC Proceeding: (1) would impair their core property rights to possess, use, and dispose of their property; (2) concerns the liability of one individual to another; (3) seeks to regulate transactions between private individuals interacting in a pre-existing market; and (4) contemplates payment by one private party to another. ECF No. 21 at 19-20. None of these arguments are availing. As to Plaintiffs' first point, the Supreme Court has clearly stated that "no party had a 'vested right' to import anything into the country." Jarkesy,

603 U.S. at 129 (citing Oceanic Steam Navigation Co., 214 U.S. at 335). Second, in a Section 337 Proceeding, there is no liability determination in the traditional sense. Instead, the ITC Proceeding purely revolves around determining whether challenged goods shall be excluded from entry into the United States and any patent validity determination has no preclusive effect. Third, the primary purpose of a Section 337 proceeding is not to resolve disputes between private parties, but instead to protect the public and domestic industry from the negative impacts of unfair practices in import trade. Fourth, Plaintiffs' assertion that any payment is contemplated overstates the framework under 19 U.S.C. § 1337. Moreover, Section 1337 does not create a freestanding private damages action between private parties; instead, it establishes a regulatory exclusion regime administered by the Commission. The statute's bond provisions provide as follows: (1) the respondent may be permitted to engage in the interim importation (potentially, during any presidential review period) by posting a bond that may be forfeited to the complainant if respondent is later found to have violated the provisions of § 1337; and (2) the Commission may require a complainant to post bond as a prerequisite to the issuance of an order under § 1337 such that, if the respondent is found not to have violated any provisions, the bond may be forfeited to the respondent. 19 U.S.C. § 1337(e), (f), (j). The mere fact that an administrative proceeding involves some

19

potential monetary loss is not enough on its own to convert the entire matter into a private right. See Oceanic Steam Navigation Co., 214 U.S. at 331-34.

Finally, Plaintiffs cite to a handful of old English cases that do not appear to fit with the unique nature of the ITC Proceeding in terms of presenting a sufficiently similar historical analogue for comparison. See ECF No. 21 Ex. B-E. However, to the extent they may be applicable, modern Supreme Court precedent sufficiently provides for the finding that the ITC Proceeding falls within the public rights exception, such that these old English cases are not determinative on this issue. Therefore, Plaintiffs have not sufficiently demonstrated that the ITC Proceeding involves private rights; in turn, PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION will be denied.

### 2. Plaintiffs Have Not Sufficiently Demonstrated That They Have a Right to a Jury Trial

In addition to their Article III claim, COUNT III challenges the ITC Proceeding under the Fifth and Seventh Amendments. The Fifth Amendment contention is presented as an integral part of the Seventh Amendment argument in that Plaintiffs claim that the denial of a jury trial constitutes a deprivation of due process of law.

The Seventh Amendment preserves the "right of trial by jury" in "[s]uits at common law, where the value in controversy shall exceed twenty dollars . . . ." "[W]hen Congress creates new

20

statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'" Atlas Roofing Co., Inc. v. Occupational Safety & Health Rev. Comm'n, 430 U.S. 442, 455 (1977). In other words, "if Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal, then the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." Granfinanciera, 492 U.S. at 53-54. Thus, the finding in the preceding section that the ITC Proceeding likely involves public rights (such that non-Article III adjudication is permitted) largely resolves Plaintiffs' Seventh Amendment challenge. See Oil States, 584 U.S. at 345 ("Thus, our rejection of Oil States' Article III challenge also resolves its Seventh Amendment challenge. Because inter partes review is a matter that Congress can properly assign to the PTO, a jury is not necessary in these proceedings."). Because the ITC Proceeding appears to be a matter that Congress can properly assign to the Commission for adjudication in a non-Article III tribunal, a jury is not necessary in the ITC Proceeding.

However, even assuming arguendo that the ITC Proceeding involves private rights, such that Article III adjudication was constitutionally required, there is good reason to believe that

the ITC Proceeding in this case still does not implicate the Seventh Amendment right to a jury trial.

By its text, the Seventh Amendment guarantees that in "[s]uits at common law, . . . the right of trial by jury shall be preserved . . . ." "In construing this language, [the Supreme Court has] noted that the right is not limited to the 'common-law forms of action recognized' when the Seventh Amendment was ratified." Jarkesy, 603 U.S. at 122 (citing Curtis v. Loether, 415 U.S. 189, 193 (1974)). "The Seventh Amendment extends to a particular statutory claim if the claim is 'legal in nature.'" Jarkesy, 603 U.S. at 122 (citing Granfinanciera, 492 U.S. at 53). To determine whether a claim is legal in nature, one must consider the cause of action and the remedy it provides. "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. . . . Second, we examine the remedy sought and determine whether it is legal or equitable in nature." Tull v. United States, 481 U.S. 412, 417-418 (1987) (internal citations omitted).

When comparing the challenged ITC Proceeding to 18th-century actions brought in the courts of England before the merger of the courts of law and equity, the impact on the analysis in this case is unclear. While prototypical patent infringement cases seeking damages proceeded in courts of law, patent infringement suits that only sought injunctive relief proceeded in the Chancery courts.

22

However, if patent validity was challenged during those equitable proceedings, that validity determination would historically have been sent to a court of law for resolution. See generally H. Tomás Gómez-Arostegui & Sean Bottomley, Patent-Infringement Suits and the Right to A Jury Trial, 72 Am. U. L. Rev. 1293 (2023); Edward C. Walterscheid, The Early Evolution of the United States Patent Law: Antecedents (Part 3), 77 J. Pat. & Trademark Off. Soc'y 771 (1995).

Because some causes of action sound in both law and equity, the Supreme Court has instructed that the remedy was the more important consideration. See Jarkesy 603 U.S. at 122-23. Here, the remedy is all but dispositive. The remedy in an ITC Proceeding is clearly equitable in nature, only calling for the exclusion of certain challenges goods from entry into the United States.

Plaintiffs argue that the bond requirement of Section 1337 shows that the remedy is legal, rather than equitable. However, any minor bond payments required by the Commission do not transform the core nature of the remedy available in Section 337 proceedings before the Commission. The bond payments contemplated by 19 U.S.C. § 1337 function not as a civil penalty designed to punish culpable individuals, but instead serve only to "restore the status quo" from any potential damage that occurs during the pendency of the ITC Proceeding. Jarkesy, 603 U.S. at 123, (quoting Tull, 481 U.S. at 422). This is clearly not the sort of remedy that could only be enforced in courts of law. See Jarkesy, 603 U.S. at 123.

23

On balance, given that the nature of the remedy is the more important consideration, the analysis called for by Tull shows that the Seventh Amendment is not implicated. Accordingly, Plaintiffs fail to establish they are likely to succeed on the merits of their Seventh Amendment challenge to the ITC Proceeding.[2]

**B. Whether Plaintiffs are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief**

Second, Plaintiffs must show that they will suffer an immediate and irreparable injury if the preliminary injunction is not granted. The likelihood of irreparable harm must be more than just a possibility. Di Biase, 872 F.3d at 230. Irreparable harm "is suffered when monetary damages are difficult to ascertain or are inadequate." Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994) (quoting Danielson v. Local 275, 479 F.2d 1033, 1037 (2d Cir. 1973)).

Primarily relying on Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. 175 (2023), Plaintiffs assert that subjection to the allegedly unconstitutional ITC Proceeding is a "'here-and-now' injury" that can justify immediate judicial intervention. ECF No. 21 at 26; see Axon Enter., Inc., 598 U.S. at 191-92. ("The claim,

---

[2] Because the Fifth Amendment due process argument depends on the Seventh Amendment contention, the Fifth Amendment theory fails as well.

24

again, is about subjection to an illegitimate proceeding . . . . And as to that grievance, the court of appeals can do nothing: A proceeding that has already happened cannot be undone. Judicial review of Axon's (and Cochran's) structural constitutional claims would come too late to be meaningful."). In turn, Plaintiffs argue that, whether or not they prevail in the ITC Proceedings, they will have no opportunity to seek remedy for the harm they are suffering (i.e., being forced to participate in an allegedly unconstitutional proceeding). ECF No. 21 at 26.

Plaintiffs may be reading Axon for more than it is worth. "Axon did not address the issue of irreparable harm, or any other issue regarding entitlement to injunctive relief." Leachco, Inc. v. Consumer Prod. Safety Comm'n, 103 F.4th 748, 758 (10th Cir. 2024), cert. denied, 145 S. Ct. 1047 (2025). "The [Supreme] Court in Axon only addressed whether the petitioners, who were respondents in administrative enforcement actions before the SEC and FTC, could initially bring collateral challenges in federal district court to the constitutionality of those agencies' structure." Id. (citing Axon, 598 U.S. at 180). The Supreme Court went on to answer that strictly jurisdictional question by applying the jurisdictional factors from Thunder Basin Coal Co. v. Reich, 510 U.S. 200, (1994), but, importantly, did not address the issue of relief. See Axon, 598 U.S. at 186, 195-96.

The "here-and-now injury" statements from Axon relied upon by Plaintiffs were made in the context of the Supreme Court's jurisdictional Thunder Basin analysis and not within the context of determining whether the plaintiff in that case was entitled to preliminary injunctive relief. Some courts have expressed concern that to read Axon as Plaintiffs would ask us to would, in effect, convert the Supreme Court's limited jurisdictional holding "into a broad ruling that creates an entitlement on the merits to a preliminary injunction in every case where such constitutional challenges are raised." Leachco, 103 F.4th at 759; see Manis v. U.S. Dep't of Agric., No. 24-1367, 2025 WL 2389422, at *4 (4th Cir. Aug. 21, 2025) (unpublished) (per curiam) ("Extending the holding of Axon in this circumstance would require a per se finding of irreparable harm whenever a plaintiff alleges constitutional deficiency in a collateral proceeding challenging their subjection to an agency proceeding.").[3]

The Tenth Circuit in Leachco rejected the applicability of the holding in Axon to the context of irreparable injury analysis when determining whether to grant a preliminary injunction. In

---

[3] The Fourth Circuit, in its per curiam opinion in Manis, rejected Plaintiffs' proposed reading of Axon. In so doing, the Fourth Circuit followed the Tenth Circuit and the D.C. Circuit in its interpretation of Axon. See Leachco, Inc. v. Consumer Prod. Safety Comm'n, 103 F.4th 748 (10th Cir. 2024); Alpine Sec. Corp. v. Fin. Indus. Regul. Auth., 121 F.4th 1314 (D.C. Cir. 2024), cert. denied, 145 S. Ct. 2751 (2025).

turn, the Tenth Circuit found that a party's ability to establish a likelihood of irreparable harm when alleging a "constitutional-violation-as-irreparable-injury" "is predicated entirely on [their] ability to prevail on [their] constitutional arguments . . . ." Leachco, 103 F.4th at 759-60 (citing Free the Nipple-Fort Collins v. City of Fort Collins, Colorado, 916 F.3d 792, 804 (10th Cir. 2019) ("[I]n the context of constitutional claims, the ['constitutional-violation-as-irreparable-injury'] principle collapses the first and second preliminary-injunction factors, equating likelihood of success on the merits with a demonstration of irreparable injury."). In other words, if a plaintiff can establish likelihood of success on the merits regarding their constitutional challenge to the ongoing administrative proceeding, irreparable injury is also satisfied.

While the discussion in Axon about "here-and-now" injuries was not directly related to the preliminary injunction analytical framework, Judge Walker, in his partial dissent in Alpine, provides rationale for adopting the Axon language when evaluating whether a party has suffered irreparable injury for the purposes of obtaining a preliminary injunction. See Alpine Sec. Corp, 121 F.4th at 1348-51 (Walker, J., dissenting in part). According to Judge Walker, "[i]rreparable harm has two components. The asserted injury must be certain and imminent. And it must be something that can't later be fixed by 'adequate compensation or other corrective

27

relief.'" Id. at 1348 (quoting Chaplaincy of Full Gospel Churches

v. England, 454 F.3d 290, 297-98 (D.C. Cir. 2006)) (internal

citations omitted). As explained by Judge Walker in dissent:

> [t]he Supreme Court's recent decision in Axon
> Enterprise, Inc. v. FTC tells us that Alpine faces
> certain and imminent harm that cannot later be fixed.
> There, as here, the regulated party challenged the
> constitutionality of an enforcement action because the
> decisionmakers were "insufficiently accountable to the
> President." There, as here, the regulated party objected
> to the "harm" of "being subjected" to an
> "unconstitutional . . . proceeding by an unaccountable"
> decisionmaker. And there, as here, being subjected "to
> an illegitimate proceeding, led by an illegitimate
> decisionmaker" was "a here-and-now injury" that "is
> impossible to remedy once the proceeding is over"
> because a "proceeding that has already happened cannot
> be undone."

Alpine, 121 F.4th at 1348 (citations omitted). And there is reason

to think that this approach would not lead to the potential

consequences highlighted by Tenth and Fourth Circuits, as:

> [n]one of this means that "every agency proceeding
> already underway must immediately be halted because of
> an asserted constitutional flaw." The movant must show,
> among other things, a likelihood of success on the
> merits. So assuming that most administrative agencies
> are structured in a way that complies with the
> Constitution, there will be no wave of preliminary
> injunctions.

Id. at 1349 (internal citation omitted) (emphasis added).

As an unpublished opinion, the holding in Manis does not bind

this Court. In this case, whether the Court adopts the Tenth

Circuit's approach or the recommendation of Judge Walker in

dissent, the result would be the same. Even if the language of

28

Axon directly applied would lead one to believe that the irreparable injury facet of the preliminary injunction calculus is per se satisfied in all cases where a constitutional challenge against an administrative proceeding is brought, the plaintiff must still establish a likelihood of success on the merits to obtain a preliminary injunction. In turn, there appears to be no practical difference between these two analytical frameworks, because, in the end, they both ultimately depend upon the ability of the party to prevail on the determination of their likelihood of success on the merits. Here, Plaintiffs are not likely to succeed on the merits and, in turn, have failed to satisfy their burden of establishing that they are likely to suffer irreparable harm in the absence of preliminary relief.

The other independent allegations of irreparable harm raised by Plaintiffs fall short. Plaintiffs assert that the ITC Proceeding broadly harms their "overall business operations, including their ability to innovate and compete effectively with JUUL, and their goodwill with customers and partners" and claim "[t]hat harm is irreparable." ECF No. 21 at 27. Plaintiffs highlight that the prospect of an exclusion or cease-and-desist order negatively impacts their ability to operate, plan, and grow. ECF No. 21 at 28. By way of example, Plaintiffs mention that their ability to invest in new products for importation is being chilled by the unresolved threat of exclusion of their products from importation.

ECF No. 21 at 28. This sort of impact, according to Plaintiffs, could also have downstream impacts on their commercial relationships in this industry. ECF No. 21 at 28-29.

"Generally, 'irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.'" Multi-Channel TV Cable Co., 22 F.3d at 551 (quoting Danielson, 479 F.2d at 1037). "[I]rreparable harm can include 'actual and imminent' 'loss of good will or erosion of a company's customer base.'" Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc., 131 F.4th 205, 239 (4th Cir. 2025) (quoting Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc., No. 8:24-CV-313, 2024 WL 3569493, at *12 (D. Md. July 29, 2024), aff'd, 131 F.4th 205 (4th Cir. 2025)); see also Fed. Leasing, Inc. v. Underwriters at Lloyd's, 650 F.2d 495, 500 (4th Cir. 1981) (harm to "relations with customers and investors" and "the good will built up by a heretofore successful enterprise" may be irreparable). But to "establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell, 915 F.3d 197, 216 (4th Cir. 2019) (quoting Direx, 952 F.2d at 812).

As in Direx, the additional harms identified by Plaintiffs here are not "present or immediate but merely problematic, conditioned on possible future events . . . ." Direx, 952 F.2d at

30

816. The generalized allegations of harm to relationships with customers or business partners or loss of goodwill are simply too speculative at this stage to satisfy the irreparable harm prong.

**C. Whether the Balance of Hardships and Public Interest Favor Plaintiffs**

The final two factors—the balance of hardships and the public interest—typically "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 428, 434-35 (2009). Here, the balance and hardships and public interest do not sufficiently favor Plaintiffs in this case to justify preliminary relief.

On balance, when weighed against the prospect of being subjected to a potentially unconstitutional proceeding (although, the analysis on the "merits" factor suggests that outcome is not likely), it appears that the public interest in protecting domestic industries from unfair foreign imports practices is far more important. Additionally, with the ALJ finding in Plaintiffs' favor, even with the understanding that the initial determination is currently being appealed, the balance of hardships do not sufficiently favor Plaintiffs, and, in turn, weigh in favor of denying the request for preliminary injunction.

Plaintiffs argue that the Government "is in no way harmed by issuance of a preliminary injunction which prevents the [government] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an

31

injunction." ECF No. 21 at 29 (quoting Leaders of a Beautiful Struggle v. Baltimore Police Dep't, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). However, that holding depends entirely upon the premise assumed here by Plaintiffs that the challenged practice is "likely to be found unconstitutional," once again linking back to the merits analysis. But that is not the case here, as there is serious reason to doubt that Plaintiffs will prevail on their Article III challenge to the ITC Proceeding. Accordingly, Plaintiffs have not shown that the balance of hardships and public interest favor granting preliminary relief.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs failed to satisfy any of the Winter factors. Therefore, PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 20) will be denied by forthcoming order.

/s/ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: June 11, 2026

32